**HOLLAND et al. v. BROWN.**

No. 2441.

Court of Civil Appeals of Texas. Beaumont.
Nov. 11, 1933.

Rehearings Denied Jan. 3, 1934.

E. L. Reid, of Orange, and Chas. T. Butler, of Beaumont, for appellants.

W. D. Gordon and L. J. Benckenstein, all of Beaumont, for appellee.

WALKER, Chief Justice.

This case was filed in the district court of Jefferson county on the 19th day of November, 1931, by H. Lutcher Brown, appellee, against appellants, George E. Holland, Edgar A. Holland, son of George E. Holland, and his wife, Novalene B. Holland, and their two minor children, Edwina Holland and George E. Holland, Jr. During the pendency of the case in the lower court, American National Bank of Beaumont, having been duly appointed guardian of the two minors, answered in their behalf, as one of the defendants. The judgment of the lower court was against all the defendants, and all of them have joined in the prosecution of the appeal to this court.

The nature and result of the case as tried in the lower court may be stated as follows: Appellant Judge George E. Holland, for twenty-five years before the filing of this suit, had been the confidential attorney of appellee and his father before him, and since his father's death, of his mother and his brother, E. W. Brown, Jr., who owned property worth many millions of dollars. On the 12th day of April, 1929, appellant Judge George E. Holland owned 1,000 shares of the common stock and 1,000 shares of the preferred stock, of the par value of $100 each, of the Brown Paper Mill Company, a Louisiana corporation with its principal office in the city of Monroe, La.; on that date Judge Holland's daughter-in-law, Mrs. Novalene B. Holland, and her two minor children, as named above, each owned 25 shares of the common stock and 25 shares of the preferred stock of the Brown Paper Mill Company. On that date Judge Holland, Joe Miller, and appellee H. L. Brown, and his mother, Carrie L. Brown, and his brother, E. W. Brown, Jr., held and owned together as a syndicate $400,000 worth of the preferred stock of the Brown Paper Mill Company, paid for by them by money borrowed from New Orleans and Houston banks, for which they gave their joint notes. Of this syndicate obligation it was agreed by the parties thereto that Judge Holland owed $75,000, as representing the stock owned by him in the company, and $2,875 for his daughter-in-law and the same sum for each of his grandchildren, making his total syndicate obligation $83,625. Judge Holland's interest in this syndicate stock was duly issued, and on the date it was issued, it was indorsed by him in blank and delivered to Mr. Sells, one of the stockholders in the company, who held it until appellee called for it under the terms of his option contract, copied below. For three or four weeks prior to the date above mentioned, Judge Holland had been negotiating with appellee for the purpose of selling him all his stock and the stock owned by his daughter-in-law and two grandchildren in the Brown Paper Mill Company. On the day mentioned, these parties entered into the following written contract for the conditional sale and purchase of Judge Holland's stock:

"State of Texas, County of Jefferson

"This option, contract and agreement, entered into this day between George E. Holland, of Jefferson County, and H. L. Brown, of Harris County, witnesseth:

"George E. Holland is the present owner and holder of one thousand (1000) shares of the Cumulative Preferred Stock of the Brown Paper Mill Company of Monroe, Louisiana, at present evidenced by interim certificate No. 18, dated February 5, 1927, issued to him by said Company; and is also the owner of One Thousand (1000) shares of the capital stock in said Brown Paper Mill Company evidenced by ten (10) certificates of One Hundred (100) shares each, issued to him and held by the said Holland under date February 2, 1924, each of which said shares, both common and preferred, are of the par value of One Hundred ($100.00) Dollars each, making the total amount of the stock, common and preferred, Two Hundred Thousand ($200,000.00) Dollars.

"The said Brown desires, and the said Holland hereby gives to him the right upon the consideration and terms hereinafter recited to purchase said stock at any time within five (5) years from the date hereof for the total sum and price of Five Hundred Thirty-eight Thousand ($538,000.00) Dollars.

"As a consideration for this option the said Brown agrees and obligates himself hereby to pay to the said Holland the sum of Thirty-two Thousand Two Hundred Eighty ($32,280.00) Dollars each year pending this option, which shall be paid semiannually on the 1st. day of June and the 1st. day of December, payable at Orange, Texas, *and which shall be payment of the interest on the notes.* (G. E. H.)

"The said Brown shall have the right upon sixty (60) days notice before that time given, on any payment date to pay for and take such stock, or any part thereof, paying the agreed price therefor, to wit: The Preferred at par and the common stock at 4.38, that is Four Dollars and Thirty-eight Cents ($4.38), for each One ($1.00) Dollar par value thereof.

At the expiration of the five (5) year period should the said Brown elect not to take said stock, or any part thereof, he shall have the right to cancel this agreement, but if he should elect to take said stock he shall pay therefor the price herein agreed upon and fixed. *All Dividends on stock during life of this agreement to be paid to said Brown and stock may be re-issued to him.* (G. E. H.)

"As a part hereof, and evidencing the obligation, the said Brown has this day made, ex-

ecuted and delivered to the said Holland his promissory note (not negotiable) in said sum of Five Hundred Thirty-eight Thousand ($538,000.00) Dollars payable on demand and bearing six per cent (6%) per annum interest from its date.

"Witness our hands in duplicate original this the 12th. of April, A. D. 1929.

"[Signed]   Geo. E. Holland
"[Signed]   H. L. Brown.

"Witness
"Emily W. Brown
"Joe Miller."

At the time Judge Holland and appellee agreed upon the terms of the foregoing option contract, they also contracted, as between themselves, for the purchase by appellee of the stock of Mrs. Novalene Holland and her two minor children, and of Judge Holland's interest in the $400,000 syndicate preferred stock and the assumption of his syndicate obligations. These additional conditions of the contract between Judge Holland and appellee were not written into the option contract as copied above, but rested in parol and were to the following effect, as testified to by appellee upon the trial of this case; this testimony also reflects appellee's understanding of the legal effect of the written option contract, copied above:

"Q. I want you now to tell this court in a straightforward manner just how this transaction came up and what was said to you by Mr. Holland and what you said to Mr. Holland, up to the time that your signature was attached to this option. A. Why, I can't remember verbatim everything that was said. There were some things were said and I can tell the meat of the thing, just as it was.

"Well, my brother, Edgar, told me that Mr. Holland had offered his stock to him, and, as I remember it, he said it was $6.00 for one, or six for one, and so when I came over on the way home—that was in Orange—on my way home to Houston, I stopped at Hotel Beaumont (Beaumont, Texas) and called Mr. Holland up and asked him to come down to the hotel and have lunch with me. And Mr. Holland did come down there. And I told him that Edgar had told me that he had offered his stock to him, and that I might be able to take an option on his stock, but the price he had asked Edgar for the stock was entirely too high; that there would have to be a lower value set on the stock. And so we talked quite a lot about the stock then, as best I remember it, we adjourned and went into the lobby of the Hotel Beaumont—by the way Joe Miller was with me at the time—and we went out in the lobby, as I remember it. We were in the dining room first. We went out into the lobby and we sat there just about in front of the elevators, and we talked a long time about it. Joe Miller was traveling around first one place and the other. Mr. Holland had very high ideas about the stock.

Joe every now and then would come in and say something about the stock being worth this enormous figure.

"Q. How do you know he had high ideas about it? A. Well, because, I was going to say, he talked about it being worth ten times the earning value and that sort of things. I mean, ten times the earnings, and even more than that; compared it with stocks on the stock exchange in that way, drawing that comparison, and therefore the stock should be worth a great deal of money. And of course, that didn't mean anything at all to me. And so, after talking for quite a while, pro and con, on the thing, why, Mr. Holland agreed that $5.00 would be a fair value to place on the stock in this option. And he then asked me about the children's stock. And I told him, of course, I meant the children's stock would also have—that that would also be part of it; that I wanted to take it all in this option. And he objected to that; said that he didn't see any reason for the children giving an option on their stock. And finally I said, 'Well, all right, I'll just take their stock outright; I'll buy their stock.' And then he asked about this syndicate note, and I agreed, for a consideration, part of the consideration of the option, that if he would let me have the option on his stock, that I would excuse him; in other words, I would take his part on this syndicate note and carry it and relieve him of his endorsement on the notes;' at the same time I was to receive all dividends from this stock while I held the option on it and paid him for the option; I was to receive all the dividends on the stock.

"*   *   *   Well, that's the trade; that's the way it was made. That was the agreement.   *   *.   *

"Q. That took place in the—  A. Hotel, lobby of the Hotel Beaumont.

"Q. About what time was that? Before this paper was signed? A. Oh, that was quite a little while, two or three weeks.

"Q. Two or three weeks? A. Yes sir, and I told him, though, when we were talking, in the conversation, that I wouldn't be interested in the option or any of it, unless arrangements could be made for the increase in the plant capacity, and just let the thing ride over like that until I went to Chicago and talked and tried to make arrangements for the increased capacity of the plant; which we did. And I went, after going to Chicago and going into this thing with the Continental Bank alone, why, I succeeded in getting the Continental to make offers. They offered to do these things, in a general way, you see, with no details; but they just offered that they would buy the bonds, and that would assist in this drawing up—I mean in financing the increase in the plant, and they said how much that they would be willing to pay us for the bonds and the debentures.

"Q. Now, that was the trip that you made to Chicago shortly after the informal conversation with Mr. Holland? A. That's right.

"Q. In the Hotel Beaumont? A. Yes sir. And they made me this offer. Well, then, of course, I came back and got the family together and the stockholders and directors, and we then agreed that that was a liberal offer, and it was fair and that I should go up and consummate the trade. So I came back—I don't remember whether that happened before or after, right this minute; I can't say; but whether it happened before I came back to see Mr. Holland or right after—but getting back to this: I came over to see Mr. Holland (in Beaumont, Texas) on my way to Houston from Orange, and told Mr. Holland of this offer that the Continental Bank had offered to take the securities, and in taking them they had asked and said they wanted 15000 shares of the 300,000—I was getting a little bit ahead of it there, in this way: that we were to organize this other company, the capital to be increased, and the 300,000 shares of common stock, and a number of other things they said should be done, and that they were to get 15000 shares of the common and 60,000 of this common stock was to be set aside for the conversion of the debentures. And I told Mr. Holland that I thought the value on his stock should be reduced in those proportions. And we sat down then and figured what that would be, and we figured it in an approximate way, and I don't know how we figured it, because I can't figure the thing out the same way and get the same figure now. If we take the 15000 and figure it on that basis, it makes 20%; and evidently the $5.00 was only reduced by 12½. I don't remember exactly the figures we used, but any way we determined that 4.38 was the right value to place on the stock in the option, and Mr. Holland agreed to that; and then Mr. Holland asked me about the preferred stock. And I thought at that time he had $140,-000.00 worth, and he told me he only had $100,000.00 worth; that he had sold forty to my mother.

"Q. Where was that conversation? A. That conversation was in his office; and—

"Q. Where? In Beaumont? A. In Beaumont.

"Q. Who was present? A. Joe Miller was present part of the time; I think he was there all the time.

"Q. Well, what time of day was it, and what date was that? A. That was in the afternoon of either one or two days before the making of this, signing of this option, which was the 12th; it was either the 10th or 11th. It must have been the 10th.

"Q. Well, how long were you there? A. Oh, I was there quite a while, quite a while. We talked over the offer made by the Continental, and then talked above arriving at the value to be placed on his stock for the purpose of writing it in the option; so it must have been an hour and a half or two hours; something like that; quite a little while. So I told Mr. Holland that I thought par was right for the preferred; and he agreed that that was all right. And then he asked what about the children's stock, that I didn't expect him to take off any percentage off of that. And, of course, I would have liked to have the percentage off, in a way, but I wanted to conform in a way to Mr. Holland's wishes in regard to the children's stock, and I did say, 'Well, that will be all right; it is a small amount.' It wasn't such a small amount, when you think about it now, but it was a small amount in comparison to his stock; and that I would pay the children $5.00 for their stock.

"Q. Was the question about the character of trade that you were willing to make with him discussed? What was said about that? A. That was all decided at the Hotel Beaumont, as I said over there, that I wasn't interested at all in any purchase of the stock at the time, but would take an option on it, but the price he had asked and offered to sell at, was too high; and that was all decided at the Beaumont Hotel, that I was to take an option on it; never any thought in my mind of ever taking it any other way.

"Q. How long an option? A. Well, I would take the option, and pay him, for the option, what would be 6% on the money involved, and I would pay it to him year by year, and—that is, I was obligated year by year; the interest was to be paid semi-annually, but I was obligated year by year, if I so desired, and could extend it for five years.

"Q. Well, after you had that talk with him in his office, he then told you that he would prepare the paper? A. No, as I recall it, he didn't. As I recall it, I said, 'Well you go ahead and draw up the papers and let me have them'—

"The Court: Let him draw what?

"Witness: I said, 'You go ahead and draw up the papers, and let me know when you have them drawn up.' And he said, 'All right; I'll bring them over to Houston.' And I said 'All right,' because I intended when he drew them up to come over.

"Mr. Reid (Attorney for appellants): Talk a little louder; I can't hear you.

"Witness: I said that I asked him to draw up the papers, and he said he would and I asked him to draw up the papers and let me know when he had them drawn up.

"Q. Did he say anything to you about— A. Well, wait; let me finish that.

"Q. All right. A. He said he would, and he said he would bring them over to Houston. And I said, 'All right; that's fine,' or something. I don't say the words, but I

agreed to that, that he would bring them over there.

"Q. The form and details about that, were they outlined or agreed to there, or was he to put that in writing later and bring it over? A. No sir, there was nothing there fixed, other than the price to be paid for the children's stock, and the value that was placed on his stock for the purpose of writing it into the option, and the value placed on the preferred stock; that was the only thing that was there talked about at all, because the option had been previously arranged in the Hotel Beaumont; that is, that I was to have an option on his common and preferred, and to have—to receive the dividends while I had it; and how much I was to pay him for the option. That was all arranged in Hotel Beaumont, and this other was just—there wouldn't have been any necessity of my coming there and discussing anything with him if it hadn't been that the Continental had asked for 15000 shares of common stock and that 60,000 shares be set aside for the debentures. Otherwise I could have just called him up and said, 'The Continental wants to go ahead; you can go ahead and draw up the papers for our option.' That was the only reason for the conversation, that I thought his stock should be reduced in that ratio, percentage there. * * *

"Q. Now, then, how long was it after you had that conversation with Mr. Holland in his office, before he came over to Houston with the papers? A. It was either a day, or two; I think it was two days.

"Q. Well, this document says it was the 12th day of April. A. That was the day that we signed the option.

"Q. Now, I want you to tell us in the same way about that transaction; who was present; what occurred, and what was said and done when you signed these papers. A. Well, it was in my office in the Esperson Building. Mr. Holland came up there in the company of Joe Miller, and brought with him the option and the stock, the children's stock. And he handed them to me, and also this note. I looked over the option, and I remember distinctly seeing the word 'option'. I just glanced over it. I didn't attempt to make any analysis of it from a legal standpoint. I am not capable of that; I couldn't do it then, and I wouldn't try it now or try it then; but I do remember seeing the word 'option' right on the start; and just glancing over it in a casual way, here and there, through it, and seeing what it outlined, along about our ideas, or my ideas. But I made no close scrutiny of it, or tried to determine it from a legal side. Mr. Holland had the stock there, and I was surprised to see the stock; in my mind I never, when it come to drawing the papers, had never visualized any stock being in it.

"Mr. Reid: If the Court please we object to the internal processes of the witness, and ask that the testimony be confined to what actually transpired on this occasion.

"Mr. Gordon: The mental process is very important in this case.

"The Court: Overruled.

"Mr. Reid: Note our exception.

"A. (continued) And so Mr. Holland said for me to take this stock and to handle it and to do everything with it, vote it, and I could reissue—

"Mr. Butler: We object to this statement by the witness that Mr. Holland told him to take this stock and just to handle it, for the reason that it seeks to vary the terms of a written instrument, and for the reason it is without any pleadings to support, and is conflicting with the pleadings of the plaintiff in this case.

"Mr. Gordon: It is not only pleaded, but shows that he actually did it—

"The Court: Objection overruled.

"Mr. Butler: Note our exception.

"Q. Go ahead. A. That I was to take it and handle it and re-issue it, to do whatever I wanted to with it; he says, 'You know more about the paper mill business than I do, and just take it and handle it.' That made me feel very happy, because I have always had a very high regard for Mr. Holland; and so I made the statement, 'You have a great deal of confidence in me, Mr. Holland,' and I was really very happy that he would have that confidence in my ability to handle the stock. And then he gave me this note to sign; that he said he should hold while I had the stock; just more of a matter of form, 'While you hold the stock, I keep the note'; and the children's stock was there also. Then we sat down there and talked, and I told him before signing this I wanted to wait, that I had asked Mrs. Brown to come up there to witness my signature; and I also stated that; that I thought she ought to know something about this transaction. Well, we waited quite a long time for her and she didn't come; and finally, after waiting quite a long time for her she did come in; and it was quite late and we had waited a long time, and I didn't take time to tell her anything about it, and never have explained things to her up to this day. I didn't read it to her, I didn't explain it to her in detail. I signed it and she witnessed it, and Joe Miller witnessed it, and the only thing that I ever told her in regard—

"Q. What you told her outside of the presence of this defendant, of course, you needn't state. A. Well, I don't know whether they heard it or not; they were right there.

"Q. Well, all right, if they were present, go ahead. A. The only thing I ever told her in regard to that thing at all was, as we were

going out the door, Joe Miller and Mr. Holland and I and Mrs. Brown, Reinhardt was there, and I told her this: I said, 'Remember, now; if anything happens to me, you don't have to pay this note; all you have to do is turn the stock back.' She says, 'Wait a minute, you'd better tell Mr. Reinhardt that.' And so I restated it, again, to Mr. Reinhardt; 'Remember, if anything happens to me, you don't have to pay this note; just return the stock.' * * *

"The Court: How long was that after you signed it? A. Oh, just a minute or two minutes; you see, we were then leaving the office going to dinner. Mr. Holland and Joe Miller were right in the door to my outer office, where Mr. Reinhardt is, my secretary; and when I told him that, he took it, and I told him to take it down and put in a safe deposit box. And then Mr. Holland, Joe Miller, and Mrs. Brown and I went down to the Rice Hotel and had lunch. And that was the end of that meeting. * * *

"Q. Now, I'll ask you, from the time Mr. Holland walked into your office with these papers and turned them over to you, if he at any time explained the legal effect of these papers to you? A. No; he made no explanation of the papers. The only thing he explained was my—me handling his stock, and my giving him that note; that was the only explanation he made.

"Q. I'll ask you if you relied upon yourself, or did you rely upon Mr. Holland in reference to the stating in legal form and effect this contract? A. I relied entirely on Mr. Holland in the legal side of this option deal; relied entirely on him.

"Q. Now, then, you signed that note? A. Yes sir.

"Q. At the same time you signed this agreement? A. Yes, sir. And I also at the same time signed for the children. I knew when I signed the children's note, I was buying that stock outright.

"Q. That is, you thought you were buying it, or did you know you were buying it? A. Well, I found out I thought I was buying. I thought I knew I was buying it. Mr. Holland fixed it up. * * *

"Q. I'll ask you this question: would you have ever executed this contract, or option, or made any transaction with Mr. Holland concerning this stock, had you known or been advised that you were placing yourself in the position of having bought Mr. Holland's stock, or that he would claim that you had actually purchased his stock? A. I certainly—

"* * * A. I certainly would have gone into no negotiations with him, had I had any idea that he would have claimed that I bought his stock; for the reasons that I gave yesterday: with the International Paper coming into the field in the south and building

mills as they were, and with the Chase National Bank of New York backing them, and with several organizations—I mean the International Paper Company itself with hundreds of millions of dollars; with them coming in as our competitors, I certainly would not have taken on any such size stock as that at that time, at any such price, or would have gone into no negotiations that we might have thought I would have to take it eventually.

"Q. I ask you the same question if you would have made any transaction with him concerning the stock of these others, defendants in this case, the lady and her children? A. The children's stock, you see, and Novalene Holland's stock, I took that, bought that, so as to get an option on Mr. Holland's stock. It was all fixed up in the same arrangement. * * * So, anyway, the values arrived at on the stock, the figures that were placed on it, to be written in this option, was $5.00, and Mr. Holland brought up about the children's stock, and I wanted that to go right in, the same. Mr. Holland made objections to that, and finally I agreed to buy the children's stock outright.

"* * * On reflecting, in that statement there, I forgot to mention, I think that one of the considerations was that I was to relieve Mr. Holland from his part in this syndicate note.

"* * * The idea was this, that in the consideration of the option, I relieved Mr. Holland of any part in this syndicate, and that was the stock in the syndicate."

After the execution of the option contract and the note recited therein and the due delivery of the contract and note, Judge Holland indorsed in blank and delivered to appellee all his stock, both common and preferred, except the syndicate stock, and also indorsed in blank and delivered to appellee the stock owned by his daughter-in-law and his two grandchildren. At the same time appellee executed and delivered to Judge Holland his three several notes, each in the sum of $15,000, payable respectively to Mrs. Novalene Holland and her two minor children. Appellee and his associates proceeded to reorganize the Brown Paper Mill Company, the Louisiana corporation, by surrendering its charter and organizing a new corporation by the same name with the same offices, under the laws of the state of Delaware. At that time the Louisiana corporation owed only a relatively small amount of debts; in the organization of the Delaware corporation it assumed all the debts of the Louisiana corporation and took over all its assets and issued new obligations in the sum of $4,500,000, which were sold to the investing public through appellee's banking connections in Chicago, Ill., and the company credited with the proceeds. The stockholders in the Louisiana corporation were subscribers to the stock of the Delaware corporation in proportion to

their holdings in the Louisiana corporation, but up to the time this case was tried no stock of any kind had been issued by the Delaware corporation. In the dissolution of the Louisiana corporation and the organization of the Delaware corporation, appellee and his brother, E. W. Brown, Jr., exercised dominion over and voted the stock of appellants as if they, in fact, owned the stock. E. W. Brown, Jr., participated in voting the stock of appellants, under a contract between him and appellee whereby if appellee purchased the stock of appellants he was to have a half interest therein. From time to time appellee, in payment for his option to purchase Judge Holland's stock, paid the interest on the note executed by him to Judge Holland until he had paid him the sum of $69,043.34; and he also paid to Judge Holland for the account of Mrs. Novalene Holland and her two minor children the sum of $5,400. He took Judge Holland's place in the syndicate contract and paid on the syndicate notes, for the account of Judge Holland, the sum of $25,-172.49. After the execution of the option contract, Judge Holland gave no further attention to the syndicate obligations, made no payments thereon, and did not join in the execution of the renewals or extensions of any of the syndicate obligations; and the syndicate obligations were renewed by the members of the syndicate, without the knowledge or participation of Judge Holland. In dealing with his stock after the execution of the option contract, Judge Holland participated in the dissolution of the Louisiana corporation and, as an attorney for appellee's financial interests, participated in the organization of the Delaware corporation, agreeing in writing thereto, and was a party to all steps taken in the reorganization. About one year after the execution of the option contract, appellee became dissatisfied with its terms on the ground that it did not distinctly specify that the payments to be made by him for his option were to be credited against the accruing interest on his note held by Judge Holland, in the event he decided to purchase the stock, and also on the ground that it did not specify that all dividends paid upon this stock, during the life of the option, were to be paid to him. To meet appellee's criticism of the option contract, Judge Holland wrote into the face of it the clauses shown in italics and initialed "G.E.H.," as shown in the contract copied above. Appellee kept his option to purchase Judge Holland's stock in force by paying from time to time the price of the option until, as stated above, he paid the total sum of $69,043.34. On or about the 3d day of July, 1931, after appellee had made all the payments stated above, he notified Judge Holland that he would not take his stock under the option contract, and tendered back to him the identical stock certificates that he had received, indorsed in blank, from Judge Holland, and demanded of Judge Hol-

land the surrender and cancellation of his notes in the following sums: Note payable to Judge Holland in the sum of $538,000, and three notes, each for the sum of $15,000, payable to Mrs. Novalene Holland and her two minor children, respectively. Judge Holland refused to accept the tender and to surrender the notes, but advised him that, as he understood the contract, he had purchased all of the stock of appellants and was obligated to pay them the sums represented by the four several promissory notes described above. Thereupon, appellee brought this suit, as already stated, against all the appellants for the cancellation of his four notes, and to recover against Judge Holland all sums paid by him under the terms of the written option and the parol contract by which he had purchased the stock of Mrs. Holland and her minor children and had assumed Judge Holland's obligations under the syndicate contract. Appellants replied by general and special exceptions, general denial and certain special denials, and by way of cross-action pleaded the due execution of the four several promissory notes already described, and prayed for judgment thereon with interest, attorney's fees, and costs, etc. A further statement of the pleadings will be given when necessary for an understanding of the propositions of law upon which appellants predicate their appeal. Upon trial to the court without a jury judgment was rendered in favor of appellee, canceling all four notes, and in his favor against Judge Holland for the $5,400 paid for the account of Mrs. Holland and her two children, and further for the sum of $25,172.49 paid for Judge Holland's account on the syndicate contract. Judgment was entered against appellee and in favor of Judge Holland on his plea for recovery of the $69,043.34. It was further ordered that appellants should receive back from appellee their original stock as tendered by him into court. Conclusions of law and fact were filed by the trial court in support of his judgment. Against that judgment all the appellants have prosecuted their appeal to this court, and appellee has cross-assigned error against the judgment of the court, refusing him recovery for the sum of $69,043.34.

### Opinion.

Appellee has made the point that the bond filed by appellants as a predicate for their appeal is insufficient to confer jurisdiction upon this court. Meeting appellee's criticisms against their original bond, appellants filed an amended bond which was in all things approved by us at the last term of court, and if appellee's exceptions be now considered as against the amended bond they are overruled. The amended bond is in strict compliance with the statutory conditions of an appeal bond.

■ There is no merit in appellants' proposition that appellee by his pleading made false

and unfounded allegations and, prior to the trial, suppressed and concealed evidence in a manner precluding him from securing the equitable relief prayed for. It seems to be a general proposition that: "One may be barred from relief by misconduct with reference to the suit itself. Thus equity may refuse to protect one who fails to make a full and free disclosure of all the facts relating to his case." 21 C. J. p. 186. This issue was presented to the lower court and correctly denied. Appellee had a reasonable explanation for all acts of concealment charged against him by appellants.

■■■ Upon the trial of this case the issue was sharply drawn by the evidence as to the intent of the parties in the execution and delivery of the written option contract copied in the statement made above. Appellee contended by his pleadings and testimony that the contract was an option at will, to be kept in force by paying semiannually the agreed consideration, with the right vested in him to cancel the option at any time, by refusing to make further payments. On the contrary, it was the contention of Judge Holland, supported by his testimony and that of his witness Joe Miller, that the contract was intended by the parties to be an absolute sale. However, Judge Holland concedes in his brief that the contract as written was a mere option, giving appellee the right to purchase his stock; his proposition now is to the effect that the controversy between him and appellee relates "to the time that the offer should remain in effect and as to whether plaintiff (appellee) by his contract was obligated to pay for the full term of the option or could terminate it at will." This issue was resolved by the trial court in favor of appellee, and the conclusions of fact on this issue have support both in the pleadings and in the evidence. As shown by appellee's testimony given above, it was clearly his intention that the contract was to remain in force only so long as he made the option payments; and that he had the right at any time to cancel the option and surrender back to Judge Holland his stock and receive back from him his note. His pleadings to the effect that Judge Holland had long been a confidential and personal attorney of his family and of their financial interests, and that he relied implicitly upon him to write the contract, and that he did not examine the contract to ascertain its legal effect and would not have known its legal effect had he examined it, and that he executed the contract believing it gave him the right to terminate it at any time by paying the agreed consideration, were allegations of fraud sufficient to support the introduction of his parol testimony in explanation of the written contract and its legal effect as understood by him at the time of its execution and delivery. Under this pleading and proof the trial court's conclusions of fact are affirmed to the effect that appellee had the right to cancel the contract at his pleasure by paying, as he did pay, the consideration for the option up to the date of its cancellation. This construction of the pleadings and evidence follows necessarily from the principles of law governing the relation between attorney and client. In Cooper v. Lee, 75 Tex. 114, 12 S. W. 483, 486, it was said: "That he who bargains in a matter of advantage with a person, placing a confidence in him, is bound to show that a reasonable use has been made of that confidence; a rule applying equally to all persons standing in confidential relations with each other." In Henyan v. Trevino (Tex. Civ. App.) 137 S. W. 458, 482, it was said: "The relation of attorney and client is one of special trust and confidence, and the law requires that all dealings between them shall be characterized by the utmost fairness and good faith. * * * It is not necessary for the client to show improper influence on the part of the attorney in order to establish the invalidity of such acquisition, for it will be presumed from the relation of attorney and client. * * * Nor will any presumption of innocence or improbability of wrongdoing be indulged in the attorney's favor." In Bryant v. Lewis (Tex. Civ. App.) 27 S.W.(2d) 604, 607, speaking of an attorney's duty to his client, it was said: "He owes his client the utmost good faith in his dealings with him, and to affirmatively disclose to him, not only all material facts which would affect their relationship but to disclose the legal consequence of those facts as well." See, also, Goar v. Thompson, 19 Tex. Civ. App. 330, 47 S. W. 61; Barnes v. McCarthy (Tex. Civ. App.) 132 S. W. 85; Bell v. Ramirez (Tex. Civ. App.) 299 S. W. 655; Parkerson v. Borst (C. C. A.) 264 F. 761; Ridge v. Healey (C. C. A.) 251 F. 798; Smith v. Richards, 13 Pet. (U. S.) 26, 10 L. Ed. 43; 3 Williston on Contracts, § 1627; 2nd Ruling Case Law (Attorneys at Law) p. 966. The failure of an attorney dealing with his client to disclose to him the material facts and the legal consequences flowing from the facts constitutes actionable fraud.

■ We overrule all of appellants' propositions to the effect that Judge Holland was not the attorney for appellee in this transaction, and that a confidential relation did not exist between them. Under the testimony of appellee, Judge Holland was his confidential adviser in all his personal business transactions. The friendship between them was the most intimate. Judge Holland was thoroughly acquainted with all the details of his business affairs. The conclusion is irresistible from appellee's testimony that he dealt with Judge Holland in this transaction on the most confidential basis, both as friend and business counselor, and looked to him as his attorney and friend to write the contract so as to effectuate fully the agreement they had made.

■■ We overrule Judge Holland's proposi-

tions that appellee, by voting the stock in the reorganization of the Brown Paper Mill Company and by contracting to sell his brother a one-half interest therein, elected to buy this stock under the terms of the written option and became bound by his conduct to pay the $538,000 note. By his answer, his' testimony, and his brief, Judge Holland brings forward many specific instances of the use of his stock by appellee, upon which he predicates his propositions of election. We do not review nor give in detail these additional acts of dominion exercised by appellee over the stock because the issues raised thereby were decided by the trial court in favor of appellee. The following authorities sustain the general proposition that, where one holds a chattel under an option to purchase, the exercise and assertion of ownership, beyond the terms of the option, operate as an irrevocable election to retain the chattel and to pay the full contract price, as per the terms of the option under which it is held: Hooser v. G. M. Carlton Bros. Co. (Tex. Civ. App.) 288 S. W. 1095; Northside Lumber & Building Co. v. Neal (Tex. Civ. App.) 23 S.W.(2d) 858; Harless v. Petty, 98 Ind. 53; Postel v. Hagist, 251 Ill. App. 454; 21 C. J. pp. 1202, 1206; 6 C. J. pp. 1114, 1115, 1128; Restatement of the Law of Contracts, vol. 1, p. 77, § 72. It is this general proposition that Judge Holland cites and relies upon in support of his theory that appellee elected to purchase his stock under the option contract. A complete answer to this contention is the statement of the terms under which he indorsed his stock in blank and delivered it to appellee. The testimony of appellee copied above is to the effect, and the court accepted it as true, that he took this stock from Judge Holland under the terms of the written option with authority to use it in all respects as he used his own; under no possible construction of the testimony offered by appellants did appellee act outside of this agreement in handling Judge Holland's stock. The evidence clearly raised the issue —we think there was no evidence to the contrary—that the very basis of the option contract was that Judge Holland should consent to the reorganization of the Brown Paper Mill Company exactly as it was reorganized and refinanced; thus, in order that the reorganization might be perfected, he agreed with appellee to reduce the sale price of his common stock from $500 a share to $438 a share. That Judge Holland so understood the contract was also shown conclusively by the additions made by him to the option contract, long after the Brown Paper Mill Company had been reorganized and after appellee had exercised practically every act of dominion over it now relied upon as constituting an election to purchase under the option; and, further, by the acts of Judge Holland in participating in the reorganization and agreeing that this very stock could be used for that

purpose. Since appellee exercised no unlawful dominion over the stock, the trial court's conclusions in his favor that he had not elected to purchase under the option have full support, and the judgment in his favor canceling the note for $538,000 is affirmed.

But appellants assert that appellee's pleadings do not support his testimony to the effect that Judge Holland, at' the time the stock was indorsed in blank and delivered to him, told him to take it and handle it and reissue it and do whatever he wanted to do with it; Judge Holland said: "You know more about the paper mill business than I do, and just take it and handle it." This contention is overruled. The specific facts thus testified to were not pleaded by appellee in rebuttal to appellants' plea that appellee had purchased the stock; but the issue was pleaded generally that Judge Holland authorized the general use that was made of the stock. The testimony complained of was admissible under this general allegation; and it was also admissible for the following additional reasons: Appellants pleaded that the stock was indorsed in blank and delivered to appellee; they pleaded further that this transaction constituted a sale. Under all the facts the stock was indorsed in blank and delivered to appellee by Judge Holland and was in his possession from that time up to the time of the institution of this suit, and under all the facts appellee exercised the very acts of dominion over the stock which, under his testimony, were authorized by Judge Holland at the time he received the stock from him. This delivery constituted a sale, or did not constitute a sale. Appellants construed it as a sale. Under his general denial, appellee could show the contract under which the stock was delivered to him, in explanation of his use of it. Horton & Horton v. House (Tex. Com. App.) 29 S.W.(2d) 984.

We overrule the cross-assignment of appellee for judgment against Judge Holland for the sum of $69,043.34, the amount paid by him on the option contract. Appellee accepted Judge Holland's stock and retained possession of it for more than two years, using it for the purposes and holding it under the conditions of the option contract. During the time this stock was in his possession, with the option to purchase, its value greatly depreciated. The value of the stock at the time it was delivered to appellee was shown beyond question to be the full amount agreed upon. Appellee received and appropriated everything granted him by the option. Having held the stock at his will and used it for the purposes of the option, it would be inequitable beyond degree to relieve him of the burdens of the contract under which he enjoyed these special benefits. It follows that the judgment of the lower court denying ap-

pellee recovery for the sum of $69,043.34 must be affirmed.

■ Appellee agreed to pay for his option not only the sum stated in the written contract, but also, as an express part of the obligation for the option, to take Judge Holland's place in the syndicate agreement and to assume and pay all obligations chargeable against him under that agreement. This was the positive, unequivocal testimony of appellee himself. We have quoted above his very words, by which he assumed this obligation. From this statement it follows that the trial court's conclusions, relieving appellee from his obligation to take Judge Holland's place in the syndicate, is against all the evidence, and the judgment of the lower court on this issue must be reversed and judgment here rendered for Judge Holland.

There is no evidence in the record that we have been able to find to the effect that, if appellee elected not to purchase Judge Holland's stock, Judge Holland was to reimburse him for the amounts advanced upon the syndicate agreement. On this construction of the undisputed evidence, the judgment of the lower court against Judge Holland for $25,172.49, paid by appellee under the syndicate agreement, must be reversed and judgment here rendered in his favor.

■ We sustain the assignment of Mrs. Novalene B. Holland that the court erred in denying her judgment against appellee on her note for $15,000 principal, interest, and attorney's fees. This conclusion is compelled by the following fact finding of the trial court: "I find that on the occasion of George E. Holland's going to Houston, Texas, to consummate his trade with plaintiff, that he was taken to Houston by his son, E. A. Holland, and his daughter-in-law, Novalene B. Holland; and that he asked the said Novalene B. Holland if she wanted him to sell her stock, and that she replied in the affirmative; and that immediately after said stock had been delivered to the plaintiff, the said George E. Holland delivered the plaintiff's note payable to Novalene B. Holland to her." This fact conclusion vested Judge Holland with absolute power to sell Mrs. Holland's stock and to deliver it to appellee. Under this conclusion, appellee took possession of her stock, not as under an option, but by his own testimony under a contract of absolute purchase. Having this possession, he exercised acts of dominion over it evidencing absolute ownership, and by the reorganization of the Louisiana corporation put it beyond his power to tender back to her the stock received from her. It conclusively follows that Mrs. Holland should have judgment against appellee for the amount of her note in the sum of $15,-000 principal, with interest thereon at the rate of 6 per cent. per annum from June 1, 1931, with 10 per cent. additional thereon as attorney's fees.

■ It is true, as contended by appellee and as found by the court, that Judge Holland was without legal authority to sell, transfer, indorse, and deliver him the stock of the two minors. But appellee accepted this delivery, appropriated the stock of the minors, and used it to the same extent and in the same way as if the sale had in all respects been legal. Though advised within less than a year that the assignment of this stock to him was not in due form, he retained it in his possession and exercised over it continuing acts of ownership and, by the reorganization of the Louisiana corporation, put it beyond his power to tender back to the minors the stock in the condition in which it was received. These facts were pleaded by the minors, through their guardian, in bar of the right of appellee to tender back their stock, and in support of their affirmative claim for judgment upon their two notes of $15,000 each. The value of the stock of the minors, at the time it was delivered to appellee, was shown beyond controversy to be the sum represented by these notes. If appellee did not acquire title through his contract with Judge Holland, he is estopped as against the minors to repudiate the contract and is in all respects liable thereon, at their election, to the same extent as if the sale had been duly authorized. In determining the rights of appellee under his contract with Judge Holland, it must be borne in mind that he did not sue for damages against Judge Holland for fraud or misrepresentation in selling him the stock of the minors, but sought rescission of the contract notwithstanding it was impossible for him to restore the minors to their original condition. It follows that the judgment of the lower court against the minors should be reversed and judgment here rendered in favor of their guardian upon the two $15,000 notes, with interest thereon at 6 per cent. per annum from the 1st day of June, 1931, and 10 per cent. additional thereon as attorney's fees.

It also follows that the judgment against Judge Holland for the sum of $5,400, the money paid to him by appellee for Mrs. Holland and her two minor children, must be reversed, and judgment here rendered in his favor.

All propositions and assignments advanced by appellants not discussed are overruled as being without merit, as are also all counter propositions of appellee not specifically discussed.

In the respects above indicated, the judgment of the lower court is affirmed; in all other respects, reversed and rendered for appellants. Affirmed in part and in part reversed and rendered.

Appellants Novalene Holland and others' motion for rehearing granted to the extent of allowing interest in favor of Novalene B. Holland, Edwina Holland, and George E. Hol-

land, Jr., from April 12, 1931, instead of June 1, 1931, as shown in the opinion on page 1104 of 66 S.W.(2d).

No written opinion was filed on the change made by the court.